## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SUMMER OPAL H.,[1]                        )
                                          )
            Plaintiff,                    )
                                          )        CIVIL ACTION
v.                                        )
                                          )        No. 23-4050-JWL
MARTIN O'MALLEY,[2]                       )
Commissioner of Social Security,          )
                                          )
            Defendant.                    )
_____  )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security denying Social Security Disability Insurance (SSDI) benefits pursuant to sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act). Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

## I.     Background

---

[1] The court makes all its "Memorandum and Order[s]" available online. Therefore, in the interest of protecting the privacy interests of Social Security disability claimants, it has determined to caption such opinions using only the initial of the Plaintiff's last name.

[2] On December 20, 2023, Mr. O'Malley was sworn in as Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. O'Malley is substituted for Acting Commissioner Kilolo Kijakazi as the defendant. Pursuant to the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

The parties previously appeared before this court in judicial review of an earlier decision of the Commissioner.  <u>Summer Opal H. v. Kijakazi</u>, Civ. A. No. 20-4078 (D. Kan. Nov. 23, 2020).  In that case, Plaintiff filed her Social Security Brief (Doc. 10), and the Commissioner filed an unopposed motion for remand pursuant to sentence four of 42 U.S.C. § 405(g).  <u>Id.</u> (Doc. 13).  The court granted the Commissioner's motion and judgment was entered in that case on September 20, 2021.  <u>Id.</u> (Docs. 14, 15); <u>see also</u> (R. 1382-85).  After further proceedings, on September 8, 2022, the ALJ issued a decision after remand finding Plaintiff not disabled and denying her claim for benefits. (R. 1298-1311).  The Appeals Council declined to assume jurisdiction of the decision after remand (R. 1277-84) and Plaintiff filed this case, seeking judicial review of the Commissioner's decision after remand.  (Doc. 1).

Plaintiff claims the ALJ erred in assessing residual functional capacity (RFC) by weighing the evidence erroneously, by erroneously evaluating the medical opinions and prior administrative medical findings[3] regarding her mental limitations, and by erroneously considering her allegations of disabling symptoms.  She also claims he erroneously relied upon the vocational expert (VE) testimony.

The court's review is guided by the Act.  <u>Wall v. Astrue</u>, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he

_____

[3] "Prior administrative medical findings" is a term of art referring to the findings of state or federal agency physicians or psychologists about a medical issue at an earlier level of review.  20 C.F.R. § 404.1513(a)(5).  Although the term is broader in scope than a "medical opinion," <u>id.</u> at § 404.1513(a)(2), the terms are often used interchangeably, and the court will follow that practice in this case except when necessary to draw a distinction.

findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). "Substantial evidence" refers to the weight, not the amount, of the evidence. It requires more than a scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988). Consequently, to overturn an agency's finding of fact the court "must find that the evidence not only supports [a contrary] conclusion, but compels it." I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481, n.1 (1992) (emphases in original).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988) (brackets in Bowling)). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not

substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the process—determining at step four whether, considering the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, she is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the

4

burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC previously assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).  The court addresses the errors alleged in Plaintiff's Social Security Brief.

## II.    Assessment of RFC

RFC is an assessment of the most a claimant can do on a regular and continuing basis despite her limitations.  20 C.F.R. § 404.1545(a); see also, White, 287 F.3d at 906, n.2.  It is an administrative assessment, based on all the evidence, of how a claimant's impairments and related symptoms affect her ability to perform work related activities.  Id.; see also Soc. Sec. Ruling (SSR) 96-5p, 1996 WL 374183, *5 (SSA 1996) ("The term 'residual functional capacity assessment' describes an adjudicator's findings about the ability of an individual to perform work-related activities."); SSR 96-8p, 1996 WL 374184, *2 (SSA 1996) ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s) including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.").  The Commissioner has provided eleven examples of the types of evidence to be considered in making an RFC assessment, including:  medical history, medical signs and laboratory findings, effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, attempts to work, need for a structured living environment, and work evaluations.  SSR 96-8p, 1996 WL 374184, at *5.

Although an ALJ is not an acceptable medical source qualified to render a medical opinion, "the ALJ, not a physician, is charged with determining a claimant's RFC from

the medical record." <u>Howard v. Barnhart</u>, 379 F.3d 945, 949 (10th Cir. 2004).  "And the ALJ's RFC assessment is an administrative, rather than a medical determination." <u>McDonald v. Astrue</u>, 492 F. App'x 875, 885 (10th Cir. 2012) (citing SSR 96-05p, 1996 WL 374183, at *5).  Because RFC assessment is made based on "all of the evidence in the record, not only the medical evidence, [it is] well within the province of the ALJ." <u>Dixon v. Apfel</u>, No. 98-5167, 1999 WL 651389, at **2 (10th Cir. Aug. 26, 1999); 20 C.F.R. § 404.1545(a).  Moreover, the final responsibility for determining RFC rests with the Commissioner.  20 C.F.R. §§ 404.1527(e)(2), 404.1546.

The Commissioner issued SSR 96-8p "[t]o state the Social Security Administration's policies and policy interpretations regarding the assessment of residual functional capacity (RFC) in initial claims for disability benefits."  1996 WL 374184, *1 (SSA 1996).  The ruling includes narrative discussion requirements for the RFC assessment.  <u>Id.</u> at *6-7.  The discussion is to cite specific medical facts and nonmedical evidence to describe how the evidence supports each conclusion, discuss the claimant's ability to perform sustained work activities, and describe the maximum amount of each work activity the claimant can perform.  <u>Id.</u>, at *7.  The discussion must include an explanation how any ambiguities and material inconsistencies in the evidence were considered and resolved.  <u>Id.</u>  It must include consideration of the claimant's allegations of symptoms and consideration of medical opinions regarding the claimant's capabilities. <u>Id.</u>  It "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and

other evidence." Id.  If the ALJ's RFC assessment conflicts with a medical source opinion, the ALJ must explain why he did not adopt the opinion.  Id.

The regulations explain how an ALJ must evaluate medical opinions.  20 C.F.R. § 404.1520c.  That regulation provides that the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."  20 C.F.R. § 404.1520c(a).  The regulation provides that the SSA will consider each medical source's opinions using five factors; supportability, consistency, relationship of source to claimant, specialization, and other factors tending to support or contradict a medical opinion or prior administrative medical finding.  20 C.F.R. § 404.1520c(a)(c)(1-5).  It provides that the most important factors in evaluating persuasiveness are supportability and consistency.  Id.

The regulation explains that the decision will articulate how persuasive the SSA finds all medical opinions and prior administrative medical findings.  20 C.F.R. § 404.1520c(b).  The articulation requirement applies for each source, but not for each opinion of that source separately.  20 C.F.R. § 404.1520c(b)(1).  It requires that the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision."  20 C.F.R. § 404.1520c(b)(2).  Finally, the regulation explains that the SSA is not required to articulate how it considered evidence from non-medical sources.  20 C.F.R. § 404.1520c(d).

**A.**      **The Parties' Arguments**

7

Plaintiff points out the ALJ found she has moderate limitations in each of the four broad areas of mental functioning:  understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (Pl. Br. 7).  Plaintiff claims the ALJ erred in relying on normal mental status examination findings made during treatment for impairments unrelated to her mental health providers' treatment.  Id. at 8 (citing Allison M. v. Saul, No. 2:19-CV-2517-JAR, 2020 WL 2101281, at *6 (D. Kan. May 1, 2020) (error when the ALJ relied upon normal examination findings from medical visits not related to the impairment at issue)).

Plaintiff claims, "The ALJ failed to properly evaluate [sic] the persuasiveness of the medical opinions by articulating the supportability and consistency with the opinions of other medical sources."  Id. at 10.  She argues the ALJ erred in finding Dr. Ambilichu's opinion inconsistent with other record evidence because he cited only Dr. Deutch's neuropsychological testing showing a full-scale IQ of average to low average and he

> did not explain how claimant's IQ scores were relevant to the opinion of Dr. Ambilichu that claimant's multiple mental conditions affected her ability to function on a daily basis.  The severity of a person's mental illness does not, in most cases, correlate with their IQ.

Id. 12.

She also argues that in discounting Dr. Deutch's opinion, the ALJ didn't explain the inconsistency between the improved IQ and the doctor's opinion of a severe decrease in the ability to function.  She argues it is not clear what the ALJ meant when he

"mentioned Dr. Deutch mischaracterized the results that [P]laintiff's effort was "very questionable" on the CVLT-III [test]" or how that "relates to any of Dr. Deutch's findings." (Pl. Br. 13). She argues, "The ALJ appears to be substituting his own unsubstantiated opinions for that of a medical expert. An ALJ must not 'interpose his own "medical expertise" over that of a physician.'" Id. at 12-13 (quoting Kemp v. Bowen, 816 F.2d 1469, 1476 (10th Cir. 1987)).

Plaintiff argues,

The ALJ did not articulate what was vague about the narrative residual functional capacity [opined by state agency psychologist] Dr. Marziano. And his rejection of th[ose] residual functional capacity findings is contrary to his statement that Dr. Marziano's opinions were "supported by a review and summary of the medical evidence of record."

Id. at 15 (quoting R. 1308). She continues,

Even though the ALJ appears to have adopted Dr. Marziano's restrictions following detailed instructions, sustaining extended attention/concentration, maintaining pace, and handling change, he found plaintiff could follow detailed instructions and did not include limitations for sustaining attention and concentration and maintaining pace.

Id.

In three sentences, Plaintiff argues the ALJ's finding she has the severe impairment of panic disorder with agoraphobia is sufficient by itself to require finding disability because the American Psychological Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Ed., Text Revision (DSM-5-TR) requires that such a "diagnosis should only be made with persistent symptoms of fear, anxiety and avoidance persists that cause significant distress or impairment in social, occupational, and other important areas of functioning." Id. 15-16 and n.1 (citing DSM-5-TR, § 300.22).

Plaintiff cites the ALJ's finding moderate limitations in the broad mental functional area of concentrating, persisting, and maintaining pace and argues the ALJ's RFC assessment "does not include restrictions for plaintiff's reduced ability to concentrate and persist."  (Pl. Br. 16).  She cites R.M.M. v. Saul, 2020 WL 6701195, *4 (D. Kan. Nov. 13, 2020) for the proposition that "[l]imiting plaintiff to jobs that were unskilled, simple, and repetitive does not adequately account for her moderate inability to concentrate and persist."  (Pl. Br. 16).

Finally, Plaintiff argues (by implication)  that the ALJ erred in evaluating her allegation of symptoms because "[t]here is brief mention of her daily activities, [but] no mention of any precipitating or aggravating factors, type, dosage, effectiveness and side effects of her medications, or discussion of measures she uses to relieve her symptoms, all of which is required by § 404.1529 (c)(3) and SSR 16-3p."  Id. 17.

The Commissioner argues the ALJ applied the correct legal standard in evaluating the medical opinions and that (more than) substantial evidence supports his findings. (Comm'r Br. 7).  He then spends the next five pages of his brief citing record evidence which, in his view, supports the ALJ's evaluation of Dr. Ambilichu's, Dr. Deutch's, and Dr. Marziano's opinions.  Id. 8-12.  He argues that R.M.M. v. Saul, does not stand for the proposition for which Plaintiff cites it.  Id. 12, n.7.

He argues that in asserting Plaintiff's agoraphobia is alone disabling, she does not point to "medical evidence in the record that demands greater restrictions than found by the ALJ."  Id.  He argues, "examination findings throughout the record show no deficits in interacting or communicating with others, and showing [sic] a cooperative attitude,

normal behavior, and normal eye contact." (Comm'r Br. 12) (citing R. 304, 457, 500, 509, 553, 558, 668, 816, 1189, 1236, 1240, 1251).

The Commissioner provides this response to Plaintiff's implied argument that the ALJ erred in evaluating her allegation of symptoms:

> Plaintiff appears to argue in one paragraph that the ALJ committed some form of error when assessing his [sic] subjective complaints but fails to articulate exactly what that error might be (Pl. Br. at 17). Notably, Plaintiff fails to point to any evidence contradicting the ALJ's findings or develop any argument that he committed reversible error. Such undeveloped arguments have been forfeited. See Eateries, Inc. v. J.R. Simplot Co., 346 F.3d 1225, 1232 (10th Cir. 2003) ("A party forfeits an issue it does not support with legal authority or argument." (citation and quotation omitted)). Courts should not address an issue that has been inadequately developed or argued. See Murrell v. Shalala, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (holding that perfunctory complaints of error that fail to develop an issue are insufficient to invoke appellate review); Kirkpatrick v. Colvin, 663 F. App'x 646, 649 (10th Cir. 2016) (noting that "it isn't [the Court's] obligation to search the record and construct a party's arguments.").

Id. 13. He then dedicates the next two pages to demonstrating the ALJ followed the correct legal standard for evaluating a claimant's allegations of symptoms and that substantial record evidence supports his findings. Id. 14-15

The court agrees with both the Commissioner's argument that Plaintiff has forfeited an argument of error in evaluating Plaintiff's allegations and his argument in support of the ALJ's findings in that regard. Therefore, it will dedicate no more time to this issue save to emphasize that both Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012) and Trujillo v. Comm'r, SSA, 818 F. App'x 835, 843 (10th Cir. 2020) recognize that a factor-by-factor discussion of the regulatory factors for evaluating a claimant's allegations of symptoms is not required. Moreover, the Tenth Circuit has long

recognized the requirement—that an ALJ must specifically link his credibility findings to the evidence—does not demand a formalistic factor-by-factor recitation of the evidence so long as the ALJ sets forth the specific evidence he relies on in his evaluation.  Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).  He did so here.  The court finds no error in the ALJ's evaluation of Plaintiff's allegations of disabling symptoms.

### B.      The ALJ's Relevant Findings

In discussing his finding Plaintiff's mental impairments did not meet or equal the severity of a listed mental impairment at step three of the sequential evaluation process, the ALJ explained why he found moderate but not marked or extreme limitations in all four broad mental functional areas:

> The medical evidence, which is discussed in detail below, fails to document the presence of objectively discernible medical signs reasonably consistent with a finding that the claimant had a marked or extreme limitation in any of the functional areas that comprise the "paragraph B" criteria prior to her date last insured.  Specifically, mental status examinations sometimes showed impaired memory or concentration (Ex. 3F/13; 7F/7, 12; 20F/28, 32).  However, other exams frequently indicated that her memory, attention, and concentration were within normal limits (Ex. 3F/13, 73-74; 4F/7, 54; 15F/16, 20; 20F/6).  Neuropsychological testing revealed mostly mild to moderate deficits in intellectual functioning, with the claimant's full-scale IQ scores falling in the average to low average range (Ex. 1F; 11F).  While the examiner indicated that the claimant exhibited a severe deterioration in functioning at the second evaluation, her ability to understand and perform test demands was still within normal limits, she did not require supervision to maintain task orientation, and her overall ability to sustain concentration and task attention was within normal limits.  Additionally, the examiner noted under Tests of Effort that the claimant's effort was very questionable on CVLT-III.  Nevertheless, she performed in high average, superior, average [sic] in the majority of WAIS-IV categories (Ex. 11F).  Meanwhile, the undersigned notes the record does not document the claimant having any problems in functioning socially when seeking treatment.  For example, she is not noted to have had difficulty waiting in public areas, to behave inappropriately with office staff, or to be unable to

form a therapeutic rapport with treatment providers.  In addition, the
claimant frequently had a normal mood and affect, was described as
cooperative, and made appropriate eye contact (Ex. 2F/4; 4F/7, 50, 59;
5F/6, 11; 7F/2; 10F/19; 16F/3; 20F/4, 8, 19).

(R. 1302-03).

As potentially relevant to mental, social, and cognitive functioning, the ALJ

assessed the following RFC for the relevant period before Plaintiff's date last insured.

She needed to avoid all unusual hazards - defined in SSR 96-9p as "moving
mechanical parts of equipment, tools, or machinery; electrical shock;
working in high, exposed places; exposure to radiation; working with
explosives; and exposure to toxic, caustic chemicals." She was able to
apply common sense understanding to carry out detailed but uninvolved
instructions in the performance of simple, routine, repetitive tasks; in a
work environment free of fast-paced production requirements; involving
only simple work-related decisions; and with few, if any, workplace
changes.  She could have occasional interaction with the general public, and
frequent interaction with coworkers and supervisors.

Id. at 1304.[4]

The ALJ provided a detailed two-page summary of Plaintiff's relevant mental

health treatment during the relevant time.  (R. 1306-07).  The ALJ provided an extensive

explanation of his evaluation of the mental health medical opinions of Dr. Marziano, Dr.

Ambilichu, and Dr. Deutch.  The court quotes the entirety of the ALJ's discussion of the

mental medical opinions, and because the ALJ also discussed the persuasiveness of Dr.

---

[4] Because Plaintiff's insured status for SSDI ended on June 30, 2018 (R. 1300), four years
before the decision in this case, the ALJ used the past tense when discussing Plaintiff's
abilities and limitations and the relevant evidence in this case.  The ALJ's decision was
limited to the period between September 1, 2014, and June 30, 2018.  That is also the
period over which the court gives consideration for judicial review.

Deutch's opinion when he summarized Dr. Deutch's treatment, the court includes that

summary here:

> The claimant underwent a neuropsychological evaluation with Neal Deutch,
> Ph.D., in January 2015, where she reported problems with cognitive
> functioning following an accident in 2003 (Ex. 1F/1; 5F/5). The claimant
> performed in the average to low average range on most subtests, but did
> have some borderline results in learning, immediate, and delayed memory.
> Her full-scale IQ was 88, which was in the low average range (Ex. 1F/8-
> 1012). Dr. Deutch indicated that the claimant had mild impairment in
> perceptual reasoning, working memory, and processing speed and moderate
> impairment in memory compared with her pre-morbid functioning. He
> further noted that the claimant was taking several medications with sedating
> effects that have the potential for effecting [sic] cognitive functioning (Ex.
> 1F/12-13).
>
> Dr. Deutch evaluated the claimant again in July 2018 (Ex. 11F). At that
> time, the claimant reported that her problems with cognitive functioning did
> not become noticeable until approximately March 2017, which is clearly
> inconsistent with her reports at the previous evaluation (Ex. 11F/1). Dr.
> Deutch noted that the claimant presented with decreased upper extremity
> dexterity, deficits in processing speed, sustained concentration, and divided
> attention, verbally and visually mediated memory, language, and aspects of
> executive functioning. He further stated that the claimant's presentation
> suggests a severe deterioration in functioning that is likely related to a
> mood and behavior disorder and medication with sedating features (Ex.
> 11F/8). However, Dr. Deutch's conclusions are not consistent with [his]
> observations that claimant was only mildly anxious, that her ability to
> understand and perform test demands was within normal limits, and need
> for supervision to maintain the claimant's task orientation was unnecessary.
> Additionally, contrary to his statement that testing was not suggestive of
> poor effort, Dr. Deutch noted under Tests of Effort that her effort was <u>very
> questionable</u> on CVLT-III. Her low average performance in digit span
> forward is also inconsistent with her average performance on the more
> difficult tasks such as digit span backward, sequencing, and arithmetic.
> Moreover, despite these inconsistencies, her overall ability to sustain
> concentration and task attention was within normal limits and she
> performed in high average, superior, average [sic] in the majority of the
> WAIS-IV categories. Even her full-scale IQ score, 95, was in the average
> range and represents a modest improvement compared with her previous
> test results (Ex. 11F/3-5). Thus, Dr. Deutch's conclusions are not well
> supported by his own findings and test results and are not persuasive.

Overall, the medical evidence of record prior to June 30, 2018, is not entirely consistent with the claimant's allegations of disabling psychiatric symptoms. Although she reported increased symptoms due to the situation involving her daughter, mental status examinations and formal neuropsychological tests have not revealed any serious chronic cognitive deficits. On the contrary, Dr. Deutch's psychological evaluations revealed that the claimant's general intellectual functioning was in the average to low average range. Nor is there any consistent evidence of serious difficulty interacting or communicating with others, beyond her self-reports. Thus, the evidence as a whole does not reflect signs and symptoms of a severity that would have precluded her from performing simple, routine, repetitive tasks, making simple work-related decisions, or interacting appropriately with others on a sustained basis.

In making these findings, the undersigned considered the prior administrative medical findings by State agency psychological consultant Vincent Marziano, Ph.D. (Ex. 4A). Dr. Marziano opined that the claimant has moderate limitations in all four areas of mental functioning, and is able to follow 1-2 step commands in a sustained manner, but will encounter difficulties following detailed instructions, sustaining extended attention/concentration, maintaining pace, and handling change. Dr. Marziano's opinions are supported by a review and summary of the medical evidence of record, and the mental status examinations, psychological evaluation results, and inconsistencies in the claimant's self-reported activities of daily living are consistent with moderate psychological limitations. However, his opinion that the claimant is limited to no more than 1-2 step tasks is not consistent with the multiple exams showing normal attention, concentration, and memory, or the psychological evaluations showing that her general intellectual functioning was intact. Meanwhile, the rest of his narrative residual functional capacity is vague, and does not describe specific functional limitations. Therefore, his opinion is persuasive with regard to the claimant's moderate limitations in the paragraph B criteria, but not persuasive with regard to her mental residual functional capacity.

As directed by the Appeals Council, the undersigned has also considered the findings and conclusions of Dr. Deutch (Ex. 10A/4; 11F). As noted above, Dr. Deutch indicated that the claimant presented with decreased upper extremity dexterity, deficits in processing speed, sustained concentration, and divided attention, verbally and visually mediated memory, language, and aspects of executive functioning. He further stated that the claimant's presentation suggests a severe deterioration in functioning that is likely related to a mood and behavior disorder and

medication with sedating features (Ex. 11F/8).  However, also as previously discussed, Dr. Deutch's opinions are not entirely consistent with his own findings and test results, such as the relative improvement in the claimant's full-scale IQ compared with previous testing, or his apparent mischaracterization of the results showing that the claimant's effort was <u>very questionable</u> on CVLT-III.  His suggestion that the claimant's functioning has severely deteriorated is also inconsistent with the other mental status examinations throughout the record, which have noted similar findings as before, as well as the claimant's lack of mental health treatment between November 2017 and February 2019.  Because his opinions are neither well supported nor consistent with the other substantial evidence of record, they are not persuasive.

The record also contains a medical source statement from the claimant's psychiatrist, Moses Ambilichu, M.D., indicating that the claimant is unable to meet competitive standards or has no useful ability to function in almost all areas of mental functioning (Ex. 18F).  Dr. Ambilichu's own treatment notes do not document any cognitive or behavioral deficits reasonably consistent with his conclusions.  Indeed, other than a depressed mood and affect, his notes consistently reflect the claimant's normal attitude and behavior, speech, though[t] process [sic], and cognition (e.g., Ex. 20F/4-12).  Therefore, his opinions are unsupported.  Moreover, his opinions are inconsistent with the other substantial evidence of record, including the neuropsychological testing showing the claimant's full-scale IQ to be in the average to low average range.  Therefore, because Dr. Ambilichu's opinions are not well supported and are inconsistent with the other evidence of record, the undersigned does not find them to be persuasive.  Additionally, the undersigned notes that Dr. Ambilichu specifically indicated that the limitations described in his medical source statement did not apply until March 17, 2019, which is approximately nine months after the claimant's date last insured.

Later, in January 2020, Dr. Ambilichu stated that the claimant's pathologies caused significant and disabling impairments in all areas of functioning, including occupational ability, which existed prior to June 2018 (Ex. 22F).  Once again, his opinion is not supported by his own treatment notes and essentially normal mental status examinations, or consistent with the other substantial evidence of record.  Moreover, these statements relate directly to the ultimate issue of whether the claimant is disabled under the act, which is reserved to the Commissioner (20 CFR 404.1527(e)).  For these reasons, they are not persuasive.

(R. 1307-09) (emphases in original) (brackets added).

**C.**    **Analysis**

Plaintiff's claim of error in the ALJ's reliance on normal mental status examinations unrelated to her mental impairments is without merit.  All medical practitioners are trained and qualified to perform mental status examinations.  If, during a treatment or examination visit, a practitioner performs and records a mental status examination, that practitioner must have felt the examination was at least relevant, if not necessary, to the purpose of the visit or treatment.  Moreover, if a medical practitioner performs and records a mental status examination and the patient has mental impairments which produce disabling symptoms it is reasonable to assume the mental status examination would reveal evidence of such disabling symptoms.  Therefore, it is appropriate for an ALJ to consider and rely upon the record of that examination if, as in this case, it is relevant to his evaluation of disability.

The record evidence relied upon by the ALJ and objected to by the Plaintiff in this case supports that understanding.  For example, Plaintiff objects to the ALJ's reliance on treatment notes from a hospital admission in which it was recorded that she was alert and oriented (Ex. 4F/3, R. 453) ("A/Ox3"), that she had a normal mood and affect, and that her memory and cognition were normal.  (Ex. 4F/7, R. 457).  That admission was because of intractable vomiting and nausea, however the treatment notes reveal, "It is thought that her intractable vomiting is related to her gastroparesis and that both are secondary to her Marijuana usage."  (Ex. 4F/10, R. 460).  Thus, the notes clearly relate to potential mental impairment.

Plaintiff also complains of the ALJ's reliance on a statement in the treatment notes from MidAmerica Rehabilitation Hospital that she was cooperative and her mood and affect were appropriate.  (7F/2, R. 668).  Similarly in this record, Plaintiff demonstrated some psychological issues and at one point there was a "plan to transfer to psychiatric hospital when available."  (7F/21, R. 687).

Finally, many of the records relied upon by the ALJ as recording Plaintiff was alert and oriented, denied having suicidal or homicidal ideation, had a normal mood and affect, was cooperative and made appropriate eye contact, and her memory, attention, and concentration were within normal limits come from mental health treatment notes.  (R. 1306) (citing Exs. 3F, 5F, 7F, and 20F).  Plaintiff simply has not shown error in the ALJ's reliance on record evidence of relatively normal mental status exams.

Plaintiff's appeal to Allison M. v. Saul, Civ. A. No. 19-2517-JAR, 2020 WL 2101281, at *6 (D. Kan. May 1, 2020) does not change the court's analysis.  This case is to be distinguished because, as the Commissioner points out, Allison M. was decided under the old treating physician rule wherein the ALJ evaluated the relative weight of medical opinions affording deference to the opinions of treating physicians.  In that case the ALJ had accorded only "some" weight to the opinion of a treating physician, Dr. Perry.  Id.  The court noted the ALJ discounted the opinion because "a majority of Plaintiff's visits [with Dr. Perry] indicated normal findings."  Id.  It noted that two of the citations to normal findings were to a visit for an annual examination and a visit for "sore throat, ear pain, and diarrhea."  Id.  Based upon these two visits, and without discussing what findings the "majority" of Plaintiff's visits with Dr. Perry revealed, the court held it

could not find substantial evidence to support the ALJ's discounting Dr. Perry's opinion. Id.  As noted above, Allison M. is to be distinguished for this reason.  Also, and perhaps more importantly, it does not appear the court recognized that "substantial evidence" is only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion—a deferential standard, requiring more than a scintilla of evidence but less than a preponderance.

Plaintiff's claim that limiting her "to jobs that were unskilled, simple, and repetitive does not adequately account for her moderate inability to concentrate and persist" (Pl. Br. 16) misunderstands and ignores both the ALJ's step three findings and the RFC he assessed.  As Plaintiff acknowledges, in his step three finding the ALJ found Plaintiff moderately limited in all four broad mental areas of mental functioning including the area of "concentrating, persisting, or maintaining pace."  (R. 1303) (emphasis added) (cited at (Pl. Br. 16)).  Plaintiff's suggestion that a moderate limitation in this broad mental functional area requires limitations in concentrating or persisting ignores that that this functional area deals with concentrating, persisting, or maintaining pace and does not require limitations in all three areas to be moderately limited in the broad area.  Moreover, Plaintiff ignores the mental RFC assessed.  As quoted above, the RFC assessed by the ALJ provides that Plaintiff

> was able to apply common sense understanding to carry out detailed but uninvolved instructions in the performance of simple, routine, repetitive tasks; in a work environment free of fast-paced production requirements; involving only simple work-related decisions; and with few, if any, workplace changes.  She could have occasional interaction with the general public, and frequent interaction with coworkers and supervisors.

(R. 1304).  Plaintiff makes no attempt to explain or support with record evidence why the mental RFC assessed is inadequate to account for a moderate limitation in the broad mental functional area of concentrating, persisting, or maintaining pace.  Nor does she point to record evidence which would compel greater limitations.  Thus, even if R.M.M. v. Saul, Case No. 20-1068-SAC, 2020 WL 6701195 *4 (D. Kan. Nov. 13, 2020) stands for the proposition that a limitation to unskilled, simple, and repetitive work inadequately accounts for moderate limitations in the ability to concentrate and persist, that is not the case here.

Plaintiff's argument that the ALJ found Plaintiff has the severe impairment of panic disorder with agoraphobia and should have found this condition disabling fairs no better.  As Plaintiff argues, the ALJ found she has severe mental impairments including panic disorder with agoraphobia.  However, although Plaintiff asserts an "inability to leave her house without suffering extreme anxiety due to her diagnosed agoraphobic condition," she points to no record evidence compelling a finding that she is unable to leave her house or that when she leaves her house she has extreme anxiety precluding work within the RFC assessed by the ALJ.  (Pl. Br. 16).  Moreover, the ALJ found no "consistent evidence of serious difficulty interacting or communicating with others, beyond her self-reports."  (R. 1307).  Plaintiff has not shown otherwise.

The court finds no error in the ALJ's evaluation of the persuasiveness of the medical opinions.  As quoted above, the ALJ gave extensive consideration to and discussion of the medical opinions of Dr. Ambilichu, Dr. Deutch, and Dr. Marziano. Supra, 14-16.  The ALJ thoroughly articulated his consideration of the factors of

consistency and supportability.  He explained he found Dr. Deutch's opinions not

persuasive because they "are not well supported by his own findings and test results" (R.

1307); and because they "are neither well supported nor consistent with the other

substantial evidence of record."  Id. at 1308.  He found Dr. Marziano's "opinion is

persuasive with regard to the claimant's moderate limitations in the paragraph B criteria

[(four broad mental functional areas)], but not persuasive with regard to her mental

residual functional capacity."  Id.  He found Dr. Ambilichu's 2019 opinions not

persuasive because they are not supported by his treatment notes and are inconsistent

with other record evidence and did not apply until March 2019, after Plaintiff's date last

insured.  Id.  He found Dr. Ambilichu's 2020 opinions unpersuasive because they are not

supported by his own treatment notes which also contained "essentially normal mental

status examinations" and are inconsistent with the other record evidence, and because his

statements Plaintiff had disabling impairments in all areas of functioning is an issue

reserved to the Commissioner.  Id. 1308-09.  In each paragraph in which the ALJ

expressed his conclusion regarding persuasiveness, he also explained the bases for

finding insufficient support and for finding inconsistencies.  Id. 1307-09.

    While Plaintiff argues the ALJ should have provided better, clearer, or different

explanations, she does not cite record evidence which compels findings different than

those reached by the ALJ.  Such arguments merely ask the court to weigh the evidence

and substitute its judgment for that of the ALJ, something it cannot do.  Bowman, 511

F.3d at 1272; accord, Hackett, 395 F.3d at, 1172; see also, Bowling, 36 F.3d at 434 (The

court "may not reweigh the evidence in the record, nor try the issues de novo, nor

substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.")).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

Finally, Plaintiff misunderstands the ALJ's consideration of Dr. Deutch's evaluation of Plaintiff's effort in taking the psychological tests he presented, particularly the CVLT-III test.  She suggests the ALJ interposed his own medical expertise over that of Dr. Deutch in this regard.  (Pl. Br. 12-13).  Dr. Deutch reported, "Effort was observed to be good. Performance on embedded tests of effort was not suggestive of poor effort." (R. 1135).  The ALJ found, however, that "contrary to his statement that testing was not suggestive of poor effort, Dr. Deutch noted under Tests of Effort that her effort was very questionable on CVLT-III."  Id. 1307 (see also, R. 1135 where Dr. Deutch recorded "very questionable effort" in the box entitled "TESTS OF EFFORT" as his interpretation of the "CVLT-III FC RECOGNITION" test.)  This is not the ALJ interposing his medical expertise over that of Dr. Deutch.  Rather, it is the ALJ pointing out an inconsistency in Dr. Deutch's report and providing another basis for discounting his opinion.

Plaintiff has shown no error in the ALJ's RFC assessment.

**III.**     **Reliance on Vocational Expert (VE) Testimony**

The court finds no merit in Plaintiff's allegations of error in relying on the VE testimony.  Plaintiff's first argument—that the ALJ erred in relying on the VE testimony because "the VE testified if 10% of the workday plaintiff was unable to maintain concentration, persistence and pace, to maintain regular attendance and be punctual, to complete a normal workday without interruptions from psychologically based symptoms, to perform at a consistent pace, to respond appropriately to changes in the work place, and to be with co-workers without distracting them or exhibiting behavioral extremes, there would be no work available" (Pl. Br. 18-19)—fails because the ALJ did not find Plaintiff has any of the suggested limitations (or all of these suggested limitations in combination) for 10% of the workday and Plaintiff has not shown error in his findings.

Plaintiff's argument the VE testimony is in conflict with the Dictionary of Occupational Titles (DOT) also fails because she has not demonstrated a conflict.  At the hearing, the ALJ asked the VE if her testimony had been consistent with the DOT.  (R. 1347).  She responded,

> My testimony has been consistent.  Additionally, I did supplement testimony with my work experience, education, and training in regard to the limitations involving fast-paced production requirements, contact with public, coworkers, supervisors, use of a walker, off task, the inability to maintain regular attendance and punctuality, respond to changes in the work setting, complete a normal workday, and interact with coworkers as all that information is absent from the DOT and the SCO [(Selected Characteristics of Occupations)].

Id.

Plaintiff argues the job of Lens Inserter (DICOT 713.687-026, 1991 WL 679273 (GPO Jan. 1, 2016)) is not consistent with the VE testimony because it "includes working

with a conveyor belt, which arguably implies a certain production pace or rate" which conflicts with the RFC limitation to work environment free of fast-paced production requirements.  (Pl. Br. 19).  As Plaintiff suggests the occupational definition states, "Fits lenses into plastic sunglass frames and places frames on conveyor belt that passes under heat lamps which soften frames preparatory to setting of lenses."  DICOT 713.687-026.  While one might argue the use of a conveyor belt in this job implies fast-paced production, the language of the occupational definition implies the use of the conveyor belt is to keep the worker from injuring herself by holding the frames under the heat lamps and leaves little room for Plaintiff's argument.  The VE testimony that the job fits within the RFC assessed and that she used her "work experience, education, and training in regard to the limitations involving fast-paced production requirements" (R. 1347) removes all remaining room for argument.  Plaintiff has not met her burden to show error in relying on the VE testimony.

Plaintiff argues the job of Wire Wrapper conflicts with the RFC assessed because it involves electrical shock hazard which the RFC precludes.  This is so, in Plaintiff's view because the occupational definition provides that a worker in this job "May touch lead wires to test terminals and observe signal light to verify wiring continuity."  DICOT 723.687-010, 1991 WL 679524 (GPO 2016).  Plaintiff's argument misunderstands the use of "May" items in an occupational definition.  "May" items do "not indicate that a worker will sometimes perform this task but rather that some workers in different establishments generally perform one of the varied tasks listed."  DOT, Parts of the Occupational Definition (5)(c), underline available online at Parts of the Occupational Definition -

DOT Dictionary of Occupational Titles (occupationalinfo.org), last visited May 20, 2024.

Moreover, even if every wire wrapper job involved continuity testing, that does not involve the unusual hazard of electrical shock.  This is so because "[i]n a continuity test, a small voltage is applied to the two points of the circuit that need to be checked. The current flow between these two points determines if it's an open or closed circuit."

Available online at, How To Perform a Continuity Test for Electric Components with Multimeter? (electricaltechnology.org) (emphasis added) (last visited, May 20, 2024). Additionally, the VE testified that this occupation is available to an individual with the RFC assessed for Plaintiff.  Plaintiff has not met her burden to demonstrate error.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated May 21, 2024, at Kansas City, Kansas.

s/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**